UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

WILLIAM LEE,

               Plaintiff,

    v.                                   ACTION NO. 4:05cv125

YORK COUNTY SCHOOL DIVISION, et al.,

               Defendants.

## OPINION AND FINAL ORDER

This matter comes before the court on the parties' cross-motions for summary judgment. For the reasons set forth herein, the court **GRANTS** the defendants' motion and **DENIES** the plaintiff's motion.

### I.  Factual and Procedural History

Since August, 2002, plaintiff William Lee has been a Spanish teacher at Tabb High School ("Tabb"), Pl.'s Aff. at ¶ 2, a public school operated by defendant York County School Board (the "School Board" or the "Board"),[1] Pl.'s Compl. at 4, ¶ 9. Lee also is the

---

[1] Lee actually states that Tabb is operated by York County School Division (the "School Division"). However, the defendants argue that the School Division is merely a geographical area – much like a county – and is not an actual entity with any authority. Defs.' Mem. in Supp. of Mot. to Dismiss at 11. The defendants thus contend that Lee's submissions confusingly refer to actions taken by the School Division, when such actions were in fact taken by the School Board. Defs.' Reply Mem. in Supp. of Mot. to Dismiss at 11. The defendants further contest whether the School Division is a proper party. Defs.' Mem. in Supp. of Mot. to Dismiss at 11.
    The court disposes of this case on the ground that Lee expressed no speech that is protected by the First Amendment, and thus need not determine if the School Division is an entity and a proper party. However, both parties agree that the School Board is a proper defendant. Hence, when Lee refers to an action taken by either the School Division or the School Board, the court, for sake

faculty sponsor of First Priority, an approved student club at Tabb.  Id. at ¶ 14.[2]  Lee alleges that Tabb High School has "a policy, custom and practice of allowing instructors to post upon the walls and bulletin boards of their assigned classrooms pictures and printed and illustrated materials that are consistent with the educational mission of the school," id. at ¶ 12; that are "of a general and personal nature that are not otherwise inconsistent with the educational mission of the school," id. at ¶ 13; or "that are consistent with the mission and/or vision of the approved club of which [the teacher is] the faculty sponsor," id. at 5, ¶ 15.

At the start of the 2004-2005 school year, Lee placed pictures and printed and illustrated materials on his classroom walls.  Id. at 5, ¶ 19.  Some of these items were of a religious nature.  Id. at 6, ¶ 20.  In October, 2004, Lee became ill and took sick leave from his teaching duties.  Id. at 7, ¶ 25.  During Lee's absence, Crispin Zanca, principal at Tabb, was informed that an individual complained about the religiously-oriented materials.  Pl.'s Memo. in Supp. of Mot. for S.J. at 2-3, ¶¶ 7-11.  Zanca went to Lee's classroom, reviewed the materials, and removed those he believed to be violations of the Establishment Clause.  Id. at 3, ¶ 12.  Lee retained counsel by January, 2005, at the latest.  See Pl.'s Aff. at 4-5, ¶ 19.  On August 11, 2005, Lee filed a Complaint in this court, alleging that the defendants violated his free speech and

of clarity, will refer to the entity as the "School Board."

[2] Lee describes First Priority as "a praise and worship group of young Christian kids."  Lee Depo. at 13.

equal protection rights under the First and Fourteenth Amendments of the United States Constitution. Lee also alleged the violation of related rights under the Virginia Constitution. Lee named as defendants York County School Division, York County School Board, Steven R. Staples, R. Page Minter, Barbara S. Haywood, Linda Meadows, Mark A. Medford, and Barrent M. Henry ("Defendants").[3] On the same day, Lee filed a Brief in Support of Plaintiff's Motion for a Preliminary Injunction. However, it was not until August 22, 2005, that Lee properly filed an actual Motion for Preliminary Injunction. Defendants responded on September 2, 2005, and Lee replied on September 8, 2005. On September 13, 2005, the court issued an Order denying Lee's motion, but ordering an expedited schedule for trial.

On October 11, 2005, Defendants submitted a Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6). On October 24, 2005, Lee submitted a Memorandum in Opposition to Defendants' Motion to Dismiss. Defendants replied on November 1, 2005. On December 14, 2005, Lee and Defendants cross-submitted motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56(a). On December 21, 2005, the parties cross-submitted responses. The parties informed the court by way of letter dated December 6, 2005, that they would forego filing replies. Since the court has considered evidence attached to the summary judgment

---

[3] Lee initially named Staples, Minter, Haywood, Meadows, Medford, and Henry in their individual and official capacities. However, on January 4, 2006, the court granted a voluntary dismissal of these parties as defendants in their individual capacities.

motions, it will merge the 12(b)(6) motion into the summary judgment motions.[4]  See Fed. R. Civ. P. 12(b) (stating that a 12(b)(6) "motion shall be treated as one for summary judgment" if a court considers "matters outside the pleading").  Moreover, counsel for both the plaintiff and the defendants have agreed that there are no material facts in dispute and that the case should be decided, as a matter of law, on the cross-motions for summary judgment submitted by the parties.  See Letter from Steven R. Zahn, Counsel for Defendants, to Elizabeth H. Paret, Clerk of the United States District Court for the Eastern District of Virginia (Dec. 21, 2005) (on file with the Clerk of the court).  Consequently, this matter is now ripe for review.

## II.  First Amendment Rights in the Materials Posted on the Classroom Walls

### 1.  Standard for Defining Lee's First Amendment Rights

The federal courts of appeals have developed at least two competing tests for determining to what extent, if at all, the First Amendment protects speech communicated by a teacher in a public school setting.  Chiras v. Miller, 432 F.3d 606, 617 n.29 (5th Cir. 2005) (detailing the circuit split); Cal. Teacher's Ass'n

---

[4] In addition to arguing that Defendants did not violate Lee's First Amendment rights, Defendants' motion to dismiss contended that the Defendants possessed qualified immunity, the School Division was not a proper party, and the School Board was protected by sovereign immunity under the Eleventh Amendment of the Federal Constitution.  Defs. Mem. in Supp. of Mot. to Dismiss at 8-13. Because the court grants Defendants' motions on First Amendment grounds, it need not consider these other issues.

v. Bd. of Educ., 271 F.3d 1141, 1149 n.6 (9th Cir. 2001) (same);[5] Karen C. Daly, Balancing Act: Teachers' Classroom Speech and the First Amendment, 30 J.L. & Educ. 1, 1-30 (2001) (discussing and analyzing the circuit split); W. Stuart Stuller, High School Academic Freedom: The Evolution of a Fish out of Water, 77 Neb. L. Rev. 301, 304 and 328-29 (1998) (same). Some courts of appeals examine teacher speech by applying Supreme Court cases concerning student speech (the "Tinker-Hazelwood" standard[6]). See, e.g., Ward v. Hickey, 996 F.2d 448, 452-53 (1st Cir. 1993). Other courts of appeals analyze teacher speech by utilizing Supreme Court cases regarding the First Amendment rights of government employees (the "Pickering-Connick" standard[7]). See, e.g., Kirkland v. Northside Indep. Sch. Dist., 890 F.2d 794, 797-800 (5th Cir. 1989).

The Fourth Circuit has adopted the Pickering-Connick approach. See Boring v. Buncombe County Bd. of Educ., 136 F.3d 364, 371 n.2 (4th Cir. 1998) (en banc) (explaining that Tinker-Hazelwood involved student speech, but a case regarding teacher speech is a matter about employee speech to be decided under Pickering-

---

[5] The Ninth Circuit actually contends that there is a third standard used by the Third Circuit, in which a teacher's speech is the government's speech and thus is warranted no First Amendment protection. Cal. Teacher's Ass'n v. Bd. of Educ., 271 F.3d 1141, 1149 n.6 (9th Cir. 2001) (discussing the Third Circuit's approach). The Third Circuit bases its approach on Rust v. Sullivan, 500 U.S. 173 (1991) and Rosenberger v. Rectors & Univ. of Va., 515 U.S. 819 (1995). See Cal. Teacher's Ass'n, 271 F.3d at 1149 n.6.

[6] See Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969); Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988).

[7] See Pickering v. Bd. of Educ., 391 U.S. 563 (1968); Connick v. Myers, 461 U.S. 138 (1983).

Connick); <u>see</u> <u>also</u> <u>id.</u> at 372-74 (Luttig, J., concurring) (explaining why <u>Tinker</u>-<u>Hazelwood</u> is inappropriate when analyzing teacher speech and that <u>Pickering</u>-<u>Connick</u> is the correct standard); <u>Chiras</u>, 432 F.3d at 617 n.29 (listing the Fourth Circuit as among the courts of appeals applying <u>Pickering</u>-<u>Connick</u> and rejecting <u>Tinker</u>-<u>Hazelwood</u>); <u>Cal. Teacher's Ass'n</u>, 271 F.3d at 1149 n.6 (same); Daly, <u>Balancing Act: Teachers' Classroom Speech and the First Amendment</u>, 30 J.L. & Educ. 1 at 16 (same); Stuller, <u>High School Academic Freedom: The Evolution of a Fish out of Water</u>, 77 Neb. L. Rev. at 328 (stating that the Fourth Circuit held "that <u>Hazelwood</u> did not supply the controlling test, but that the <u>Pickering</u>/<u>Connick</u> line of cases should be applied"). This case is not about what free speech rights Lee has as an individual expressing himself on private property. Rather, this case is a question about what free speech rights Lee has as a public school teacher-employee. Therefore, the <u>Pickering</u>-<u>Connick</u> standard applies.[8]

_____

[8] The parties assume that <u>Tinker</u>-<u>Hazelwood</u> is the proper test for analyzing the instant matter, although they do not cite any Fourth Circuit case that examined teacher speech under this standard. The parties did not address how <u>Pickering</u>-<u>Connick</u> applies to this case, or argue why <u>Boring v. Buncombe County Bd. of Educ.</u>, 136 F.3d 364 (4th Cir. 1998), would be distinguishable from the facts here. <u>But</u> <u>see</u> <u>infra</u> note 13. Consequently, the parties' legal analyses are inapposite on this matter before the court. However, the facts developed during discovery make it clear that there is no genuine dispute of material fact on summary judgment, and the parties so argue and submitted the case to the court on cross-motions for summary judgment. <u>See</u> supra at 4.

### a.  The Pickering-Connick Standard

An inquiry into whether a government employee's speech is protected by the First Amendment turns on the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Connick, 391 U.S. at 568.  Thus, a court performs a two-step analysis.  First, a court determines if "the speech at issue was that of a private citizen speaking on a matter of public concern." Urofsky v. Gilmore, 216 F.3d 401, 407 (4th Cir. 2000).  This question turns on "whether the speech is 'made primarily in the [employee's] role as citizen or primarily in his role as employee.'" Id. at 407 (quoting Terrell v. Univ. of Tex. Sys. Police, 792 F.2d 1360, 1362 (5th Cir. 1986).[9]  If the

_____

[9] Comparing the facts of Pickering and Connick demonstrates the difference between an individual speaking in his role as a citizen as opposed to one speaking in his role as an employee.  In Pickering, a local school board submitted a proposal to increase taxes to be used for educational purposes. Pickering, 391 U.S. at 566.  The superintendent of schools actively campaigned for the proposal. Id.  In response, a teacher wrote a letter to the local newspaper criticizing the school board for its poor financial management and mishandling of bond issues. Id.  The school board subsequently fired the teacher. Id.  The Court found that the letter constituted an individual expressing himself in his capacity as a private citizen, addressing a matter of public concern, rather than as a public employee. Id. at 574-75.  The teacher had made a "public communication," id. at 574; he addressed an issue that the community was currently debating, id. at 566; and "the fact of [his] employment [was] only tangentially and insubstantially" related to the content of the letter, id. at 574.  In Connick, an Assistant District Attorney (ADA) in New Orleans objected to her supervisor's decision to transfer her. Connick, 461 U.S. at 140-41.  She typed up a questionnaire regarding "office transfer policy, office morale, the need for a grievance committee," and other internal office matters. Id. at 141.  She distributed the

speech does not involve a matter of public concern, but instead addresses a "personal interest," then the speech is not protected by the First Amendment.  Stroman v. Colleton County Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992).  In such a case, the court need not continue to the second step of the analysis and "scrutinize the reasons for" the regulation.  Connick, 461 U.S. at 146; see also Urofsky, 216 F.3d at 406 (stating that if the speech "does not touch upon a matter of public concern, the state, as employer, may regulate [the speech] without infringing any First Amendment protection").[10]  If, however, the speech does touch on a matter of

questionnaire not to the public, but only to her fellow ADAs, after which she was fired. Id.  The Court found that the questionnaire – with the exception of one question regarding political corruption – was expressed in the ADA's role as an employee. Id. at 148-49.  In contrast to Pickering, the content of the questionnaire was substantially related to "the fact of employment," see Pickering, 391 U.S. at 574, and "reflect[ed] one employee's dissatisfaction with a transfer," Connick, 461 U.S. at 148.

[10] The Supreme Court has explained the rationale underlying this principle of First Amendment law.  If the speech concerns employment duties or a matter of personal interest, then the government-employer, as an employer, must "enjoy wide latitude in managing [its] offices," Connick, 461 U.S. at 146, in order to preserve "the efficient function of [its] operations," Rankin v. McPherson, 483 U.S. 378, 384 (1987).  Therefore, "the government as employer indeed has far broader powers than does the government as sovereign," Waters v. Churchill, 511 U.S. 661, 671 (1994) (plurality), and it "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large," United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 465 (1995).  "[S]peech that is of entirely private concern" might be "nondisruptive" and "of value to the speakers and the listeners," Waters, 511 U.S. at 674 (plurality), and the regulation of this speech "may not be fair," Connick, 461 U.S. at 146.  However, the Court has "declined to question government employers' decisions on such matters," Waters, 511 U.S. at 674 (plurality), and the restriction on such speech is "not subject to judicial review even if the reasons for the [regulation] are alleged to be mistaken or unreasonable," Connick, 461 U.S. at 146.

8

public concern, then the court turns to the second step of the analysis and conducts a balancing test.  This balancing determines if the employee's interest in expressing himself "outweighs the public employer's interest in what the employer has determined to be the appropriate operation of the workplace." Urofsky, 216 F.3d at 406.  If the employee's speech fails either part of the Pickering-Connick test, then the First Amendment accords it no protection.[11]  See Waters v. Churchill, 511 U.S. 661, 668 (1994) (plurality);[12] see also Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1080 (4th Cir. 1987) (explaining that even if speech addresses a matter of public concern, it is unprotected if it fails the second step in the analysis).

### b.  Boring: Applying Pickering-Connick to "Curricular Speech"

In Boring v. Buncombe County Bd. of Educ., 136 F.3d 364, 368 (4th Cir. 1996) (en banc), the Fourth Circuit created a simplified analysis for applying Pickering-Connick in the context of a public

---

[11] Speech which fails the Pickering-Connick test is not "totally beyond the protection of the First Amendment." Connick, 461 U.S. at 147.  For example, an employee who speaks on a matter of personal interest can still invoke the First Amendment in defense against a libel suit brought against him by his employer. Id.  However, "absent the most unusual circumstances," the employee can bring no action in federal court seeking First Amendment protection for his speech.  Id.  "[A] federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Id.

[12] Although Waters was a plurality opinion, the concurrences disagreed only on matters regarding a government-employer's investigation into the content of an employee's speech.  See Waters, 511 U.S. at 685-86 (Souter, J., concurring) (discussing the differences between the plurality and the concurrences).  A majority agreed on the standard rules and application of Pickering-Connick.  See generally Waters, 511 U.S. 661.

teacher's speech, by holding that "curricular speech" does not touch on a matter of public concern and is not protected by the First Amendment.[13]   In <u>Boring</u>, a drama teacher produced a student play that was performed in a statewide competition.   <u>Id.</u> at 366. The play, titled <u>Independence</u>, dealt with issues such as dysfunctional families, divorce, single parents, lesbianism, and illegitimate children.   <u>Id.</u>   The teacher was subsequently transferred.   <u>Id.</u> at 366-67.  She filed a complaint alleging "that her transfer was in retaliation for expression of unpopular views through the production of the play."   <u>Id.</u> at 367.   The court dismissed the complaint and the Fourth Circuit affirmed the dismissal, finding that the play was part of the school's curriculum.   <u>Id.</u> at 368.   It is "the school, not the teacher, [that] has the right to fix the curriculum."[14]   <u>Id.</u> at 370.   Thus,

---

[13] In a number of its briefs, Defendants cited <u>Boring</u> for the proposition that teachers have no First Amendment rights in a school's curriculum.  <u>See</u>, <u>e.g.</u>, Defs.' Mem. in Support of Mot. for S.J. at 8.  Defendants also state that "Lee is an employee of the York County Schools.  Any speech by him...is the speech of the York County Schools."  <u>Id.</u> at 10.  However, Defendants alluded to these principles in their application of the <u>Tinker</u>-<u>Hazelwood</u> standard for regulating teacher speech.  <u>See</u> <u>id.</u> at 7-10.  <u>Boring</u> was decided under the <u>Pickering</u>-<u>Connick</u> standard.  <u>See</u> <u>infra</u> notes 14-16 and accompanying text.

[14] The rationale underlying the principle that it is the school, not the teacher, that has the right to determine the curriculum is

> [T]hat the makeup of the curriculum [should] be entrusted to the local school authorities who are in some sense responsible [to the community], rather than to the teachers, who would be responsible only to the judges, had they a First Amendment right to participate in the makeup of the curriculum.

<u>Boring</u>, 136 F.3d at 371.   To grant constitutional protection to

any dispute over the content of the curriculum is a disagreement between the teacher and the employer-school that determines her employment duties. <u>Id.</u> at 369. The dispute "does not present a matter of public concern and is nothing more than an ordinary employment dispute." <u>Id.</u> at 368. The curricular speech at issue "does not constitute protected speech and has no First Amendment protection." <u>Id.</u> at 369.

---

teachers' curricular choices

> [W]ould remove from students, teachers, parents, and school boards the right to direct their educational curricula through democratic means. The curricular choices of the schools should be presumptively their own – the fact that such choices arouse deep feelings argues strongly for democratic means of reaching them.

<u>Id.</u> at 371-72 (Wilkinson, J., concurring). "'[L]egitimate' pedagogy [would] be not what the parents and schoolboards decide it should be but, rather, what the judges say it will be." <u>Id.</u> at 373-74 (Luttig, J., concurring). Therefore,

> [T]he First Amendment does not require school boards to allow individual teachers in the Nation's elementary and secondary public schools to determine the curriculum for their classrooms consistent with their own personal, political, and other views.

<u>Id.</u> at 372 (Luttig, J., concurring). <u>See also</u> <u>Urofsky</u>, 216 F.3d at 409-15 (discussing at great length that "to the extent the Constitution recognizes any right of 'academic freedom' above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors"). In <u>Urofsky</u>, the Fourth Circuit explained that its discussion of academic freedom pertained to universities, not to secondary schools, but only because academic freedom as it relates to high schools was not an issue before the court on that appeal. <u>Id.</u> at 409 n.8. However, there is no reason that the Fourth Circuit's analysis would apply any differently at the high school level, particularly in light of the rationale provided in <u>Boring</u> as to why it is the schools, and not the teachers, that have the right to set the curriculum.

Hence, curricular speech fails <u>per se</u> to be a matter of public concern.  Vital to this analysis is the definition of "curricular speech."  The <u>Boring</u> court first looked to a standard dictionary definition for determining what constitutes curriculum, finding it to comprise of "all planned school activities including, besides courses of study, organized play, athletics, dramatics, clubs, and homeroom program."  <u>Id.</u> at 367-68 (quoting Webster's Third New International Dictionary 557 (3d ed. 1971)).  This sweeping definition shows that expressive activity can constitute curricular speech, because curricular speech is comprised of "all planned school activities," not merely formal instruction, and involves the teaching of matters other than specific "courses of study."  <u>See id.</u>  The Fourth Circuit also looked to <u>Hazelwood</u> to support the broad reach of the dictionary definition:[15]

> "The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and <u>other expressive activities</u> that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.  These activities may fairly be characterized as part of the school curriculum, <u>whether or not they occur in a traditional classroom setting</u>, so long as they are supervised by faculty members and designed to impart knowledge or skills to student participants and audiences."[16]

_____

[15] The Fourth Circuit looked to <u>Hazelwood</u> only to define "curriculum," and not for any guidance regarding the constitutional rights accorded teacher speech.  <u>Boring</u>, 136 F.3d at 367-68.

[16] The quoted passage refers to "the imprimatur of the school." <u>Hazelwood</u>, 484 U.S. at 271.  However, "<u>Boring</u>, of course, did not rest upon any such notion of official imprimatur.  It rested, instead, as we said, solely on the firm belief that the teacher possessed no First Amendment right in the curriculum itself." <u>Urofsky</u>, 216 F.3d at 424 (Luttig, J., concurring).  Thus, the issue is not whether the materials "bear the imprimatur of the school,"

Boring, 136 F.3d at 368 (quoting Hazelwood, 484 U.S. at 271) (emphasis added). The language "other expressive activities" reveals that curricular speech encompasses a wide range of types of communication. The fact that the definition includes expressive activities that do not occur "in a traditional classroom setting" emphasizes that the expression need not involve the instruction of a specific course, as long as it "impart[s] knowledge or skills." See Hazelwood, 484 U.S. at 271.

Finally, curricular speech encompasses not only the content of the instructor's materials, but it also involves an instructor's teaching methodology:

> It cannot be doubted that in order to pursue its legitimate goals effectively, the state must retain the ability to control the manner in which its employees discharge their duties and to direct its employees to undertake the responsibilities of their positions in a specified way.

Urofsky, 216 F.3d at 409. Teaching methodology is nothing more than an execution of a teacher's employment duties "in a specified way." See id. Thus, "teachers' First Amendment rights [do not] extend to choosing their own curriculum or classroom management techniques in contravention of school policy or dictates." Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1176 (3d Cir. 1990). The First Amendment simply does not protect "teaching methods." Hetrick v. Martin, 480 F.2d 705, 709 (6th Cir. 1973).

---

but instead whether they are "expressive activities...supervised by faculty members and designed to impart knowledge or skills to student participants and audiences." See Hazelwood, 484 U.S. at 271.

## 2.  __Applying Boring to Lee's Postings__

The postings on Lee's classroom walls qualify as the type of materials that can constitute curricular speech.  Lee's postings are expressive activities that convey ideas and themes through text, pictures, and symbols.[17]   Moreover, Lee himself provides undisputed evidence that such materials can be used for instructive purposes. See Compl. at 4, ¶ 12 (stating that the school permits the posting of materials "that are consistent with the educational mission of the school"); Lee Aff. at 3, ¶ 11 (explaining that one reason he posts materials is "to __educate__ and exemplify in a fair and complete treatment the religious traditions of various Hispanic and pre-Hispanic societies and those which embrace the Spanish language and culture") (emphasis added); Lee Dep. at 25 ("You could staple somebody's tie on the wall and relate it to the curriculum if you wanted to.").  Thus, Lee can readily use the materials as tools of instruction.  The question here is whether Lee's postings are in fact "designed to impart knowledge" and thus constitute curricular speech. See Hazelwood, 484 U.S. at 271.  The postings are curricular speech in two ways.  First, Lee used the materials as part of his methodology of instruction.  Second, Lee seeks to instruct students on curricular matters through his postings.[18]

---

[17]  See Hazelwood, 484 U.S. at 271; see also supra notes 13-16 and accompanying text.

[18]  Principal Zanca, as well as Lee himself, repeatedly expressed that Lee's postings were not curricular.  However, Zanca's opinion was based on his view that the postings did not relate to the teaching of Spanish by Lee. See Zanca Dep. at 7, 13-14, 17, 18-19, 23, 24, 30, 32, 36, 41, 45, 47, 50, 54, and 93-94.  Thus, Zanca views as non-curricular any knowledge or skills

Lee explained that he used the materials as a means for catching his students' attention in order to teach Spanish:

> We are constantly trying to find something that will engage interest.  They've got attention spans of 5 to 10 minutes, you have to put something that would lead them into a positive and continuing focus.

Id. at 83.  Lee added that

> [Y]ou've got to do more than nouns and verbs.  You'd kill kids if it was grammar from the start of the year to the end.   You've got to talk about interesting and fascinating things, and a mix of them at that, because they can get bored with one theme.  I just found [the postings] interesting.

Id. at 87-88.  Lee specifically sought materials "that engage[d] the kids."  Id. at 28.  In fact, Lee compared the usefulness of the posters to that of using a Neil Diamond song that kept his students focused during class.  Id. at 83-84.  Lee also sought to inspire his students to learn Spanish by demonstrating that acquiring a foreign language skill can be useful to their futures.  Lee posted an article about an individual who attended a nearby high school and then joined a Christian mission in South America.  Id. at 30-

---

imparted by Lee to his students that did not relate to Spanish. Moreover, although Lee disclaims that the materials relate to his instruction of Spanish, see, e.g., Lee Dep. at 17, other statements made by him explicitly show that he considered the materials to be part of how he taught Spanish, see infra at 15-16. However, the issue here is whether Lee expressed "curricular speech" as defined by the Fourth Circuit, not by Zanca or Lee.  It is the Fourth Circuit's definition that sets the parameters of how the school is to execute its educational goals; to what extent the First Amendment does not interfere with that mission; and the degree by which Lee must accept that, as a public school teacher, it is the school's right to determine what is taught to the students.  If Lee sought to "impart knowledge or skills," even if not related to Spanish, then he sought to instruct his students.  Any such instruction is curricular speech belonging to the school and unprotected by the First Amendment.

31.   Lee posted the item because "there's [] an association [he] see[s] that the kids all find interesting."   Id. at 61.   He explained that

> It's highly relevant to me that a kid knows that somebody else in the area who studied Spanish and who tried to apply that Spanish to whatever vocation, she chose to be a missionary, but I would say that that would be altogether interesting to the average student in the classroom.

Id. at 34.

Therefore, Lee specifically used the materials to execute his teaching duties, and the postings are both part of his teaching methodology and his instruction on curricular matters.[19]

---

[19] From both Defendants and Lee's perspectives, Lee's posters had the intent and effect of imparting knowledge to his students. Zanca constantly expressed the concern that Lee was "an employee endorsing, professing his beliefs in his classroom by way of posting."   Id. at 54; see also id. at 17, 19, 42, 48, 50, 56, 58, and 62.  The fact that this belief system is religious in nature is irrelevant to this matter.   This case does not involve the Free Exercise of Religion clause of the First Amendment, but rather is a free speech case.   As such, religious speech is not favored or disfavored relative to any other kind of speech.   See Rosenberger v. Rectors & Visitors of the Univ. of Va., 515 U.S. 819, 829-32 (1995).   The only pertinent issue here is that Lee sought to use the postings to impart knowledge to his students.
   Lee portrays the materials differently from Defendants and does not describe them as "endorsing" or "promoting" any belief system.  However, his express intent in posting the materials is, for purposes of Boring, similar to Defendants' characterization. Lee explains that he is "accountable in that classroom for [the students'] welfare and their attitudes and their feelings, which are sensitive and fluctuate daily."   Id. at 19.  Thus, he placed the materials on his classroom walls in order to inculcate his students with positive messages and themes.   Id. at 19, 20-21, 27, 34, 69, 76, 77, and 78.   Consequently, he expressly sought to impart knowledge to the students.  Moreover, Supreme Court case law makes clear that teaching these very type of messages and themes is specifically part of the school's curriculum.   See, e.g., Ambach v. Norwick, 441 U.S. 68, 76-78 (1979); Bethel Sch. Dist. v. Fraser, 478 U.S. 675, 683-86 (1986); Bd. of Educ. v. Pico, 457 U.S. 853, 863-69 (1982).

### 3.  Applying the Traditional Public-Concern Analysis to Lee's Postings

Even if Lee's postings are not curricular speech, they do not express matters of public concern under the first part of the Pickering-Connick analysis.  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of [the speech], as revealed by the whole record."[20]  Connick, 461 U.S. at 147-48.  With respect to

---

[20] When defining what constitutes a "matter of public concern," the Fourth Circuit has at times used broad language indicating that the phrase encompasses a wide range of subjects.  For example, the Fourth Circuit has stated that "[s]peech involves a matter of public concern when it involves an issue of social, political, or other interest to a community."  Urofsky, 216 F.3d at 406; see also Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 353 (4th Cir. 2000) (stating that the issue is whether "a member of the community [would] be truly concerned with the employee's speech?").  However, when the Fourth Circuit has given content to the phrase "matter of public concern," it has considerably narrowed what survives the test.  The "matter" or "issue" in question must be more than broad subject matter of general interest.  The Fourth Circuit has specifically quoted Terrell v. Univ. of Tex. Sys. Police, 792 F.2d 1360 (5th Cir. 1986), to explain that

> "Because almost anything that occurs within a public agency could be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee....[T]he mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment."

Dimeglio v. Haines, 45 F.3d 790, 805 (4th Cir. 1995) (quoting Terrell, 792 F.2d at 1362); see also Harris v. Va. Beach, 1995 U.S. App. LEXIS 30912, at *14-15 (4th Cir. 1995) (unpublished).  Thus, a public concern inquiry "does not involve a determination of how interesting or important the subject of an employee's speech is."  Urofsky, 216 F.3d at 407.

> Instead, because debate on topics of public concern is fundamental to the American system of government at all levels, Pickering is designed to ensure that a governmental entity does not use its personnel decisions

content, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other <u>matters of personal interest</u>," are not matters of public concern. <u>Stroman</u>, 981 F.2d at 156 (emphasis added). Important factors in analyzing the context of the speech include (1) if the speech was made in the workplace, or if it was expressed in a public forum, <u>see</u> <u>Love-Lane v. Martin</u>, 355 F.3d 766, 777 (4th Cir. 2004);[21] (2) whether the speech was addressed to a public audience, <u>see</u> <u>United States v. Nat'l Treasury Employees Union</u>, 513 U.S. 454, 466 (1995); (3) if the speaker's intent to communicate the speech was "in any way political or involv[ing] any matter of concern to the public," <u>Holland v. Rimmer</u>, 25 F.3d 1251, 1255 (4th Cir. 1994); and (4) whether the speech was communicated in the context of a public debate about a specific issue, <u>see</u> <u>Stroman</u>, 981 F.2d at 158. As for form, various types of expression that have been factors in finding that an individual expressed a matter of public concern include a speech at a public meeting, <u>see</u> <u>Love-Lane</u>, 355 F.3d at 777; a letter to a

_____

to influence that debate. Statements that do not contribute to that debate are, consequently, afforded less protection against such governmental personnel decisions.

<u>Arvinger v. Mayor and City Council of Baltimore</u>, 862 F.2d 75, 78 (4th Cir. 1988). Thus, the inquiry generally concerns "whether the comment in question more closely resembles public debate or [a] private employment grievance." <u>Id.</u> The court looks into whether the speech "was [] made to further [] public debate" and if the government sought to "chill any part of that public debate." <u>Id.</u> at 79.

[21] This factor is not dispositive, however. An employee can choose to privately address a matter of public concern. <u>Connick</u>, 461 U.S. at 148 n.8.

local newspaper, Pickering, 391 U.S. at 574; and a presentation to members of the public, Edwards v. Goldsboro, 178 F.3d 231, 247 (4th Cir. 1999).

Not only does an analysis of all of these factors reveal that there is no genuine dispute that Lee's speech was not a matter of public concern, but there is no genuine dispute that each individual factor requires a finding for Defendants.   The court starts with context – particularly with Lee's intent in posting the materials – because Lee has so thoroughly disclaimed that his speech is about anything other than a "matter[] of personal interest."   See Stroman, 981 F.2d at 156.   During his deposition, when asked why he put up the materials, Lee said point-blank, "[f]irst and foremost, I liked them.   I liked the figures represented in them. [George Washington] is a childhood hero of mine....I like them and I think they're interesting and, frankly, I just like them."   Lee Dep. at 87.   Specific examples demonstrate that the purpose underlying Lee's expressive activity was that the materials were personally interesting to him.   When discussing the significance of putting up a poster of George Washington praying, Lee expressed that it "relates to me.   I like it.   I find the image exceptionally positive and uplifting....[because] the whole notion of faith to me is important."   Id. at 17.   Lee went on to explain that the poster is "nifty.   It's got a colonial uniform on it and I like it."   Id. at 18.   Lee added that the poster is "a beautiful portrait.   It's in line with our nation's traditions.   I find it nifty."   Id. at 19.   He further explicated that his "interest in

19

[the poster is that] it's the most colorful photograph in the room and it's cool. George Washington is a Virginian, I have always admired him like I do President Bush, despite his errors, and I like that poster." Id. at 89. When discussing why he posted articles on George Bush and John Ashcroft, he stated that "I like them. I respect and admire them. I feel that they're good guys. The article is interesting to me and positive and hope filled." Id. at 27. At least ten times in his deposition, Lee stated that he posted the materials because they were interesting to him. See Lee Dep. at 23, 24, 27, 34, 38, 41, 43, 61, 77, and 87. At least seven times, he offered as an explanation that he liked them. See id. at 17, 18, 19, 27, 28, 76, and 87. At one point, Lee compared the reason for putting up the posters to shopping:

> [W]hen something catches my eye and appeals to me, you know, like buying a new shirt, if I find it and I have room on the wall for it, I normally [post it] within thirty days of when I found it in the newspaper or a magazine, normally.

Id. at 28.

Lee posting these items because of his interest in the subject matter is no different from other teachers posting pictures of motorcycles and sports teams because they were interested in those subjects. See Zanca Dep. at 8. Other than Lee's personal interest in the materials, absolutely no evidence points to any other reason for posting them except for those previously discussed: The materials aided in Lee's instruction of his students and were part of his teaching methodology.[22] Lee explained repeatedly that he

_____

[22] See supra notes 17-19 and accompanying text.

hoped to inculcate his pupils with positive messages.[23]   He also stated that he hoped the materials would keep his students interested in the subject matter and would retain their focus and attention.[24]   As a public school teacher, Lee used these materials to help perform his job and to teach his students.

The other factors regarding context further demonstrate that Lee's speech does not touch on a matter of public concern.   Lee posted his materials in his workplace, not in a forum where members of the public would become aware of his speech.   Nor did Lee choose a private channel in which to express his views, with the hope that his message would eventually reach the public.[25]   Furthermore, the intended audience was only his students – the very individuals around whom his employment duties revolve – and himself, not the public.

The content and form of the speech also reveal that Lee did not express a matter of public concern.   The content spoke to, at most, matters of general interest.[26] It did not involve any specific issue about which the community was debating.   Nor did the content reveal any new information, such as matters of corruption or

---

[23] See supra note 19.

[24] See supra at 15-16.

[25] As discussed, an employee can choose a private channel by which to speak to a matter of public concern.   See supra note 21. However, the point is that though an employee might choose a private channel, the issue presumably would eventually, even if indirectly, come to the public's attention.   In this case, there is no evidence that Lee intended for the general public to become aware of his postings outside of his classroom.

[26] See supra at 19-20.

financial mismanagement, that would stimulate public discussion. Furthermore, the speech was not expressed in the form of a speech at a public meeting, or a letter to the editor, or a presentation to members of the public. The form was postings on walls at the workplace, which only students, co-workers, and other school employees would regularly view.

As a result of all of these undisputed facts, the court finds that there is no triable issue on whether Lee spoke to a matter of public concern.

**4. Forum Analysis**

Lee argues that Tabb created a designated public forum for teachers to express themselves on their classroom walls and classroom bulletin boards. See Pl.'s Mem. in Supp. of Mot. for S.J. at 9-12.[27]  However, his argument legally describes a limited

---

[27] The extent to which the government may regulate an individual's speech without violating his First Amendment rights depends on what kind of government property – or forum – in which the individual wishes to express himself. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44-46 (1983). The Court has identified three types of fora: the traditional public forum, the designated public forum, and the nonpublic forum. Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 802 (1985). Traditional public fora are places, such as public streets and parks, which "by long tradition or by government fiat have been devoted to assembly and debate." Perry Educ. Ass'n, 460 U.S. at 45. In a traditional public forum, content-based regulations are subject to strict scrutiny. Id. Time, place, and manner regulations must be narrowly tailored to serve a significant government interest. Id. In a nonpublic forum, speakers enjoy the least First Amendment protection: The government may issue any content-based or time, place, and manner regulation, so long as the restriction is reasonable and is viewpoint-neutral. Id. at 46. The Supreme Court has already found that public schools are nonpublic forums. Hazelwood, 484 U.S. at 267.
A designated public forum is a nonpublic forum that the government opens up to free expression of ideas, thus creating a public forum. Perry Educ. Ass'n, 460 U.S. at 45. The government's

public forum because he contends that the forum is opened only to teachers, a limited class of speakers.[28]  The Supreme Court has set forth considerable guidance for determining if the government has created a limited public forum.  The Court has emphasized that "[n]ot every instrumentality used for communication...is...a public forum by designation." Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 803 (1985).  Rather, the inquiry determines whether the government made the property "generally available" and "generally open" for free expression or discourse. Ark. Educ. TV Comm'n v. Forbes, 523 U.S. 666, 679 (1998).  Thus, "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802 (emphasis added).  A plaintiff must show that the government had an "affirmative desire," id. at 805, and a "clear intent," Hazelwood, 484 U.S. at 270, to convert its property from its traditional purposes into a forum for open discussion.

Various factors can demonstrate such an intent and desire. First, a court must analyze whether the government's "policy and practice" show that it intended to open up a nonpublic forum. Cornelius, 473 U.S. at 802.  Second, a court should examine "the

---

freedom to regulate speech is subject to the same First Amendment protection as afforded speech in a traditional public forum. Id. at 45-46.  A limited public forum is a type of designated public forum in which the government opens up a nonpublic forum to free discourse, but "only to a limited class of speakers or for limited topics." Warren v. Fairfax County, 196 F.3d 186, 193 (4th Cir. 1999) (citing Perry Educ. Ass'n, 460 U.S. at 46 n.7).

[28] See supra note 27.

nature of the property and its compatibility with expressive activity." Id. "In cases where the principal function of the property would be disrupted by expressive activity, the [Supreme] Court [has been] particularly reluctant to hold that the government intended to designate a public forum." Id. at 804. Also relevant is whether individuals have free access to the forum, or if they are required to obtain governmental permission that is granted only on an individualized, non-ministerial basis. Forbes, 523 U.S. at 679-80. Finally, the Court has cautioned that finding a limited public forum too readily can produce the averse effect of reducing speech because the government, faced with a choice between allowing unlimited discourse or no discourse at all, might choose the latter. Forbes, 523 U.S. at 681. Finding a nonpublic forum under such circumstances can "encourage the government to open its property to [at least] some expressive activity." Id.

Lee argues that Tabb has created a limited public forum, in which "the relevant 'forum' is the school's classroom walls and bulletin boards which have been opened for private expression and speech by teachers." Pl.'s Mem. in Supp. of Mot. for S.J. at 10-11. The evidence in the record shows that there is no genuine dispute that Tabb has not created a limited public forum. The court starts its analysis with the undisputed fact that Tabb does not have a policy and practice of permitting open discourse by the teachers. Lee concedes that Tabb's practice and policy is to allow teachers to post materials only if the materials are consistent with the school's educational mission, are not inconsistent with

24

the school's educational mission, or relate to a student club the
teacher sponsors. Pl.'s Compl. at 4, ¶¶ 12-14. These restrictions
immediately demonstrate a policy to keep discourse restricted and
controlled so as to not disrupt the school's function of educating
students, as opposed to permitting open discourse over which the
school would have little freedom to regulate. The evidence in the
record proves that this restriction is a reality and not merely
theoretical. The types of materials posted by Tabb teachers
include pictures of family, motorcycles, sports teams, sports
articles, sports figures, and famous quotes. Zanca Dep. at 8-9.
Teachers also have posted comic strips and materials relating to
hobbies such as arts and crafts. Lee Aff. at 1, ¶ 4. Clearly,
these postings are of a limited and innocuous nature that, at most,
speak to a narrow range of matters of personal interest. They do
not demonstrate unlimited discussion, communication, or expression.
Additionally, Zanca explained that a wide range of postings would
be subject to removal, regardless of whatever expression or
demonstration of personal interest they may possess. He stated
that "there are a lot of things that would be inappropriate to post
in a public classroom." Zanca Dep. at 11; see also Cornelius, 473
U.S. at 804 (citing as one factor against finding a designated
public forum the fact that "[t]he Government's consistent policy
has been to limit participation in the [forum] to 'appropriate'
voluntary agencies"). Zanca identified examples such as materials
that include profanity, Zanca Dep. at 11; relate to substance
abuse, id.; or are "offensive to students," id. at 19. Moreover,

25

news articles and current event articles are posted, but usually only if they pertain to the teacher's subject matter, such as in a government or history classroom. See, e.g., id. at 82-83. Consequently, Tabb simply has not given its teachers freedom to express themselves in their classrooms in any way that they please.

In addition to the fact that Tabb has not created open discourse, there is also a practice for regulating the placement of materials on the wall. Zanca's policy is based on his experience that Tabb teachers have "good judgment," Zanca Dep. at 11, and that "most people in our profession know what's right and what's wrong," id. at 13. Zanca has "always had teachers that pretty much understood what probably should be posted in the classroom and what should not."[29] Zanca Dep. at 10. Thus, he has given his teachers "discretion" without requiring prior approval. Id. at 11. However, when a teacher does not know whether something is appropriate, the expectation and practice is that the teacher will visit Zanca to ask him about the posting. Id. at 13. Most importantly, Zanca retains complete discretion to remove any material from classroom walls that he deems objectionable. Staples Dep. at 30; Zanca Dep. at 52-53 and 56-57. The fact that expressive activity is subject to such unrestricted discretion is

_____

[29] Lee has developed and cited no evidence disputing Zanca's statement that teachers have exhibited responsible judgment and line-drawing. There are no depositions from Lee or other teachers, students, parents, or witnesses indicating that inappropriate materials were posted in, or not removed from, other teachers' classrooms. Nor does the record include any administrative reports citing inappropriate materials, or any other kind of complaints. Thus, Zanca's assessment goes without contravention.

directly antithetical to the notion that the government created a limited public forum. See Forbes, 523 U.S. at 693 n.18 (Stevens, J., dissenting) ("[I]t is the standardless character of the decision to exclude Forbes that provides the basis for the Court's conclusion that the debates were a nonpublic forum rather than a limited public forum."). Moreover, Zanca's evaluation of materials is hardly ministerial. Rather, he makes individualized, case-by-case decisions, in which he scrutinizes the content of materials in context of the course an instructor teaches, and examines how the materials might relate to that course. Zanca Dep. at 46 (explaining that evaluation of a posting is based "on an item-by-item, case-by-case basis"); id. at 53 (stating that a decision to remove a posting is based on "my discretion, my determination, piece by piece, case by case"); id. at 101 ("[Y]ou have to look at individual instances, individual events before you can make a determination."); see also id. at 13-15, 18-19, 21-22, 23-24, 40-41, 45-47, 64-66, and 93-94 (describing the process by which he evaluates a posting's content in context of how the content relates to the class being taught); supra note 18 (citing instances in which Zanca evaluated Lee's materials in context of the fact that he taught Spanish).

It is true that Zanca's policy is informal and not written down. However, a written policy, though indicative of an intent to not open up a forum, is not necessary for finding that the government did not intend to create a limited public forum. See Forbes, 523 U.S. at 692 (Stevens, J., dissenting) (noting that the

majority found that there was no designated public forum although
there were "[n]o written criteria" guiding the governmental
entity's decisions).  The undisputed fact is that the policy works:
The complaint about Lee's materials was the <u>first</u> <u>time</u> in Zanca's
<u>nine</u> <u>years</u> as principal that he ever received a complaint.  Zanca
Dep. at 25-26.  It is clear that Zanca has an effective, workable
system for monitoring materials placed on the wall, and that this
system creates limited discourse at most, not free expression.

There is simply nothing in the record that shows that Tabb has
an "affirmative desire" and "clear intent" to make its classroom
walls and bulletins "generally available" for free and open
expression by its teachers.  Instead, the permitted expressive
activity is limited and demonstrates only "selective access."  <u>See</u>
<u>Forbes</u>, 523 U.S. at 679.  Moreover, finding a designated public
forum and a violation of First Amendment rights could produce less
expressive activity, as Tabb might find it necessary to prevent all
teachers from expressing themselves in order to eliminate the
designated public forum and to preserve control within the school's
walls.  <u>See</u> <u>Forbes</u>, 523 U.S. at 681.

Examining "the nature of the property and its compatibility
with expressive activity" further reveals that Tabb has not created
a limited public forum.  <u>See</u> <u>Cornelius</u>, 473 U.S. at 802.  The
Supreme Court has long emphasized "the special characteristics of
the school environment."  <u>See</u> <u>Tinker</u>, 393 U.S. at 506.[30]  The

---

[30] Although the court cites <u>Tinker</u> and other cases regarding
student speech, it does not look to these cases for guidance as to
the extent of a teacher's First Amendment rights when expressing

importance of expressive activity "must be balanced against the society's countervailing interest in teaching students" and inculcating youth with fundamental societal values. Bethel Sch. Dist. v. Fraser, 478 U.S. 675, 681 (1986). Consequently, it is essential to consider the "sensibilities" of young students. Id. Moreover, "teachers...demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class. Inescapably, like parents, they are role models." Id. at 683. "A school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." Hazelwood, 484 U.S. at 266 (internal citation omitted). "The determination of what manner of [student] speech in the classroom or in school assembly is inappropriate properly rests with the school board, rather than with the federal courts." Id. at 267 (internal citation and quotation marks omitted).

Although these cases deal with student speech, they demonstrate that the school setting is an environment that requires regulation of speech delivered within its walls.[31]  Clearly, the nature of school property cautions against finding that a school has created a limited public forum and permits largely unrestricted discourse that could so easily disrupt the school's ability to

---

himself in a school setting.  Rather, it looks to these cases for other purposes:  Just as the Fourth Circuit examined Hazelwood to define curriculum, see Boring, 136 F.3d at 368, the court reviews these cases here to analyze the nature of school property.

[31] See supra note 30.

execute its teaching function.[32]  This factor, as well as each of the factors addressed above, makes it clear that there is no genuine dispute that Tabb has not created a limited public forum on its classroom walls and classroom bulletins.

### 5.  Lee's Remaining First Amendment Arguments

Lee argues that the removal of the materials constituted viewpoint discrimination.  Pl.'s Memo. in Supp. of Mot. for S.J. at 12-15.  Lee further contends that the removal was unconstitutional because Zanca acted with unbridled discretion and there were no explicit standards guiding his decisions.  Id. at 15-19.  However, the Court has found that Lee fails the first step under Pickering-Connick because the materials are curricular speech, or, alternatively, because the speech does not implicate a matter of public concern under a conventional Pickering-Connick analysis.  At the point that the court determines that the employee's speech does not address a matter of public concern, the speech is not protected by the First Amendment.  See Stroman, 981 F.2d at 156.  The court need not "scrutinize the reasons for" the regulation, Connick, 461

---

[32] As a Boring concurrence explained:

[W]ere every public school teacher in America to have the constitutional right to design (even in part) the content of his or her individual classes...the Nation's school boards would be without even the most basic authority to implement a uniform curriculum and schools would become mere instruments for the advancement of the individual and collective social agendas of their teachers.

Boring, 136 F.3d at 373 (Luttig, J., concurring).  Although this assessment was made in a context different from forum analysis, it explains why school property is incompatible with the government creating a limited public forum.

U.S. at 146, and it terminates its inquiry, <u>Edwards</u>, 178 F.3d at 246.  <u>See</u> <u>also</u> <u>Nat. Treasury Employees Union</u>, 513 U.S. at 467 n.12 (citing <u>Arnett v. Kennedy</u>, 416 U.S. 134, 158-61 (1974) (plurality))(explaining that a plurality in an earlier decision stated that the vagueness doctrine does not apply to unprotected employee speech).  In fact, it would be inappropriate for the court to evaluate the regulation because it would result in "intrusive oversight," <u>Connick</u>, 461 U.S. at 146, that would interfere with the effectiveness of the government-employer's operations and delivery of services, <u>Waters</u>, 511 U.S. at 671-75 (plurality).  Thus, "the state, as employer, may regulate [the speech] without infringing any First Amendment protection."  <u>Urofsky</u>, 216 F.3d at 406.[33]

**III.  Lee's Other Claims**

**1.  Equal Protection Claim Under the Fourteenth Amendment of the United States Constitution**

Lee's Third Claim asserts that Tabb violated his equal protection rights under the Fourteenth Amendment of the United States Constitution.  Pl.'s Compl. at 11-12, ¶¶ 49-54.  This claim is based entirely on his First Amendment free speech claim.  He argues that "Zanca singled out Lee's expression because it contained religious references and themes."  Pl.'s Br. in Opp'n to Defs.' Mot. for S.J. at 13.  Because Zanca permitted postings based on other viewpoints, but not Lee's, "[t]his kind of disparate

---

[33] <u>See</u> <u>also</u> <u>supra</u> notes 10-12 and accompanying text (discussing the court's responsibilities once it determines that a government employee's speech does not touch on a matter of public concern).

treatment on the basis of viewpoint not only violates the First Amendment, but also violates the Equal Protection Clause."   Id.

Lee's arguments merely recast his First Amendment arguments as an equal protection claim.  He does not contend that he was treated disparately in any way other than through alleged discrimination against his viewpoint.  If a plaintiff's free speech claim fails, and an equal protection claim is "a mere rewording of [a] First Amendment [] claim," then the equal protection claim also must fail.  See Edwards, 178 F.3d at 250.  In short, Lee asks this court to do under the Fourteenth Amendment what he asks it to do under the First Amendment: to evaluate the constitutionality of an employer-school's regulation of an employee-teacher's speech.  Just as it was inappropriate to conduct such a review under the Free Speech Clause because Lee's speech does not implicate a matter of public concern, it would be inappropriate to do so under the Equal Protection Clause.   Otherwise, the court would eviscerate Pickering-Connick's guarantee that a public employer may regulate its employee's conduct to ensure the effective performance of its operations.  Thus, as there is no genuine dispute of a material fact with respect to Lee's free speech claim, there is no genuine dispute of a material fact with respect to Lee's equal protection claim.  Both claims fail as a matter of law.

## 2.  Free Speech and Equal Protection Claims Under the Virginia Constitution

Lee's Second Claim alleges that Tabb violated his free speech rights under Article I, Section 12 of the Virginia Constitution.[34] Pl.'s Compl. at 11, ¶¶ 44-48.  His Fourth Claim alleges that Tabb violated his right to equal protection under the law as guaranteed by Article I, Section 11 of the Virginia Constitution.[35]  Pl.'s Compl. at 12-13, ¶¶ 55-59.  The Virginia Supreme Court has rejected the argument that the Virginia Constitution provides greater free speech protection than does the United States Constitution.  Elliot v. Commonwealth, 267 Va. 464, 473-74 (2004).  Rather, the free speech rights guaranteed by the Virginia Constitution are "coextensive" with the protections of the United States Constitution.  Id.  The Virginia Supreme Court also has held that Article I, Section 11 "is no broader than the equal protection clause of the Fourteenth Amendment to the Constitution of the

---

[34] Article I is the Virginia Constitution's Bill of Rights. See Va. Const. Art. I.  Section 12 provides that

> [T]he General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people peaceably to assemble, and to petition the government for the redress of grievances.

Id. at § 12.

[35] Section 11 states that

> [T]he right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged.

Va. Const. Art. I, § 11.

United States." <u>Archer v. Mayes</u>, 213 Va. 633, 638 (1973). Therefore, just as there is no genuine dispute of a material fact regarding Lee's claims under the United States Constitution, there are no triable issues with respect to Lee's claims under the Virginia Constitution.

### IV. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED** and Lee's motion for summary judgment is **DENIED**.   The Clerk is **DIRECTED** to send a copy of this Opinion and Final Order to plaintiff and to counsel for defendants.[36]

**IT IS SO ORDERED.**


                                                        /s/
                                            **Rebecca Beach Smith**
**Norfolk, Virginia**

**February 23, 2006**

---

[36] An index of this Opinion is attached as Exhibit A.

## Exhibit A

## Index

I.    Factual and Procedural History_____   1

II.   First Amendment Rights in the Materials Posted
      on the Classroom Walls_____   4

      1.   Standard for Defining Lee's First Amendment
           Rights_____   4

           a.   The <u>Pickering</u>-<u>Connick</u> Standard_____   7

           b.   <u>Boring</u>: Applying <u>Pickering</u>-<u>Connick</u> to
                "Curricular Speech"_____   9

      2.   Applying <u>Boring</u> to Lee's Postings _____   14

      3.   Applying the Traditional Public-Concern Analysis
           to Lee's Postings_____   17

      4.   Forum Analysis_____   22

      5.   Lee's Remaining First Amendment Arguments_____   30

III.  Lee's Other Claims_____   31

      1.   Equal Protection Claim Under the Fourteenth
           Amendment of the Federal Constitution_____   31

      2.   Free Speech and Equal Protection Claims
           Under the Virginia Constitution_____   33

IV.   Conclusion_____   34